Please be seated. Clerk, call the next case, please. 3-10-0231, people of the Federal and Washington League of Colorado v. Sheraton, All in the name of the Lord, and by the power vested in me. Mr. Murphy. Thank you. Good morning. Good morning. Madam Clerk, Mr. Bailiff, Mr. Arado. May it please the Court. My name is Joel Murphy. I represent the defendant, Mr. Moore, in this case. And I'm asking the Court to reverse the trial court's denial of the defendant's motion to quash arrest and suppress evidence. Because with all barely due respect to Judge Shainstead, the circumstances under which he found that a reasonable person would not have considered himself to be in custody are, quite frankly, mind-boggling. What the Court relied upon and what the State relies upon are a couple of alleged statements by two detectives claiming that they told the defendant at the police station that he was not under arrest and he was free to leave at any time. First, I believe that the manifest weight of the evidence will show that, in fact, the defendant was not told that. Second, even if the Court accepts that the defendant was told that, this Court has found, as would be entirely appropriate here, that a person may still reasonably believe himself to be in custody despite officers' assurances to the contrary. And when we look closely at the circumstances surrounding that alleged statement to the defendant, the circumstances leading up to and surrounding that, any reasonable person, innocent of any crime, would reasonably believe himself to be a focus of investigation, to believe himself to be under police control, and believe himself to be in custody. Now, this alleged statement to the defendant that he was not under arrest and that he was free to leave occurred while he was in the lower-level investigation section of the police department. The defendant did not voluntarily come to the police station at the request of officers or otherwise. What happened was the defendant and the co-defendant, Mr. Mays, had made a 911 call explaining that someone had kicked in the door of the residence where they were at and someone was shot. When officers responded to the scene, the first officer that arrived saw the two defendants standing in the driveway. And what the officer did was get out of the vehicle. His license siren had been activated. He had pointed a gun at them, ordered them to the ground with their arms out to the side. He did this because he did not know what their involvement was. Now, Mr. Mays, the co-defendant, had explained to the officer what occurred, that they were there hanging out, playing video games, etc., and that an unknown subject had kicked in the door and a shot was fired and their friend, John Rosales, was shot. Three other officers arrived, and while still at gunpoint, both defendants were placed into handcuffs. And while two officers then went to clear the house, other officers still stood and guarded the defendants, seated on the ground in handcuffs. Pat-downs were conducted. No weapons were found. And although the officers admit that they felt safe, they felt unthreatened, they still left the defendant in cuffs because they were still not sure of what their involvement was. Now, the officer admitted that there was no probable cause at that point, but defendant and his friend were placed into the backseat of separate squad cars, still handcuffed, and they were left there without any further discussion for at least 15 minutes. What then happened is another officer had instructed that the defendant  a little more to see what his involvement was. Upon arrival at the Naperville Police Station, the defendant was brought down to the lower-level investigation section of the department and placed in a separate interview room than his friend, still handcuffed. Detective Liberio then claimed that he went into the interview room and he told the officers to remove the handcuffs and told the officers that they could leave. He says that they did that. He claimed that he then apologized to the defendant for the inconvenience, claimed that he told them he was not under arrest, that he was free to leave at any time, but told them, quote, that we will be taking a statement shortly. He had also told the defendant that the reason that he had been handcuffed is that there was uncertainty as to what their involvement was. The defendant was then left in the room, still separated from his friend. Now, Your Honors, if we take that statement out, that he was told he was not under arrest and he was told he was free to leave, I think it's indisputable then that the defendant would be considered under arrest and in custody at that point. And here's why the manifest way of the evidence, I believe, shows that that statement was not made and they were not told that. First, I find it troubling. Something of that significance would have been left out of the officer's report, the fact that he had told the defendant that he was free to leave. Second, what Detective Liberio said was that prior to allegedly telling the defendant he was free to leave, he had told those two other officers to uncuff him and to leave the room, and he says they did that. However, if you look at Officer Wagner's testimony, one of the officers that was in the room, he stated that he then waited outside of the interview room and waited for instruction. The other officer, Officer Rimgis, stated that he was also watching and that the co-defendant, Mr. Mays, would not have been able to leave the room and leave the station and that he wouldn't be able to do anything without Officer Rimgis watching him. The reason I state that that was the information regarding the co-defendant is I don't think there's any reason to assume that these two people are being treated any differently. So you have one officer, after being told to leave, standing outside, guarding the room, waiting for instruction, and another officer saying that they could not have come out of that room and walked out of the station and that anything that they would have done, I would have watched them. At this time, have their keys and cell phones or Mr. Morris' keys and cell phone and everything, were they still on his person? Had they been taken from him? At that point, I believe they're still on his person. And I believe also a question to ask at this point is, if these people are just witnesses at this point, they're not being treated as suspects or in custody, why isn't he then, after being apologized to, saying, hey, go join your friend, go see where your friend's at, and maybe interview them together? I imagine if people come into a police station just off the road, maybe it's a family, and they say, hey, we just witnessed this crime, the police aren't going to split them up in interview rooms and interview them separately, maybe to challenge inconsistent statements, et cetera, but they're just going to ask them what happened, what did you see, et cetera. But these two were left separate in the lower level area of the police station. And third, Detective Deutchler, another detective who claimed that she had told the defendants that they were not under arrest and free to leave, was contradicted by Detective Bish regarding that statement. I believe he had said, I don't believe that she told them they were free to leave, we just told them they were there to take a statement. And when she came in the room, Mr. Moore was physically distraught, he was crying, he was shaking, he had vomit on him, and when asked what did she tell them to calm him down, she said, I told them he needed to be cooperative, he needed to focus, and needed to provide a written statement. However, even if the court upholds the finding that the defendant was told he was free to leave, that doesn't erase the arrest or the custody as shown by the police control over the defendant, which I believe dominates the record. In fact, the evidence shows that a reasonable person would still believe himself to be in custody and the focus of an investigation. This is when he was then asked to give up his clothes because of the blood evidence, and he was placed in an orange one-piece jumpsuit that the inmates are placed in. I believe the officers would say that maybe there was nothing else available other than maybe a coat, but then why was he given the opportunity to maybe call a friend or family, hey, you want somebody to bring you up some clothes or something like that, or do you want to call somebody to let them know where you're at and what's going on? But no, it's give up the clothes, we'll step out of the room, you change in there, put your clothes outside of the room, and then they gave him the orange jumpsuit. He was covered with vomit and his own urine as well. Yes. So you say it was for the blood evidence. Why wouldn't it have been just for his own? I can't imagine sitting there in your own vomit and urine. Right, because the officer had told him the importance regarding blood evidence in a murder case, and that's why they wanted the clothes particularly. They weren't helping him get out of the situation he was in by being covered and all that. They told him specifically how important the blood evidence was. Was there a question of whose blood it could be? At that point, of course. I believe the defendant had told the police that this was the victim's blood. But at any rate. And they were investigating whether it was somebody else's. I don't know what was in the officer's mind. All I know is that they had told him that they wanted the clothes for evidence purposes, and then what they gave him in exchange was an orange one-piece jumpsuit. He was also asked to give consent to search his cell phone activity for investigative purposes. So what is a reasonable, innocent person thinking when they've told the officer that they're hanging out with friends and unknown people come in, kick in the door, and shoot somebody? Why then is this officer asking me to check my cell phone activity to investigate what's going on? Again, this is after the defendant is told that there is uncertainty as to what his involvement was. Also, look at the fact that he's asked to provide a statement in writing, and the form that he was given, which the police say was by mistake, the form that he was given says right at the top that he was advised of his rights. Again, what is a reasonable person, innocent of any crime, after all of these circumstances, going to think when, hey, I just told you everything that happened, you guys are sitting here listening to me, taking notes or whatever, and now you want me to put my statement in writing on a form that says I've been advised of my rights? Also, he was then re-interviewed again because the officers had a question or concern about his involvement. He's still separate from his friend, doesn't have his own clothes, doesn't have a ride, and now doesn't have his phone. Again, any reasonable person could not feel free to leave, would feel the control of himself by the police, and would feel that he's the focus of an investigation. Subjectively and objectively, he is under arrest at that point. Because no probable cause existed at that point, the officers, at best, were merely authorized to briefly detain the defendant and demand an explanation of his actions, but that would have been in the vicinity of where he was stopped. Because it was not done here, that is why the court erred in failing to grant the motion of clause to arrest as pressed evidence. Now, after the defendant's second interview, which ended at approximately 5.30 a.m., the defendants were located by Detective Liberio around 3.40 p.m. because a decision had been made to release them. It's unclear, other than from what I can tell, still sitting in the interview rooms. I know the co-defendant, Mr. Mays, at some point had to request permission or ask if he could go smoke a cigarette, and I know there was testimony that an officer followed him and stayed with him outside of an area of the station where he smoked a cigarette. It's unclear as to what Mr. Moore had been doing all this time. But they were located wherever they were, and they were brought upstairs to the lobby because the decision had been made about a half an hour earlier to release them. But Detective Liberio said that he was, quote, in the middle of something, which is why he didn't bring them to the lobby earlier. He says they were told they were free to leave, but the co-defendant said that he didn't have his keys. So the detective asked them to hang out here while he goes and tries to locate them. And coincidentally... No. No, not that I'm... I imagine. Now, coincidentally at this time that the officer is looking for these keys, I think this is a coincidence worthy of a movie, but that is when a sergeant contacted Detective Liberio and told him that he was receiving information through an anonymous phone call indicating that the defendants were now suspects. And he told them to secure them, to bring them down to the lower level, and Detective Liberio then told them that they were receiving new information and he wanted to, quote, confront them with that. They were then brought down again to the lower level and again separated, just the same as they had been done before. Separated in separate interview rooms. That is when the trial court finally held that they were under arrest. Thank you. So at that point the issue becomes, what is the probable cause at that point? What did they have in addition to what they had earlier? And that's where you look at... The details of the tip, Judge, are found at page 188 of the common law record. This is a female caller, unidentified, explaining the info was coming from someone with intimate knowledge of what occurred, without explaining what intimate knowledge meant. Whether they are hearing it through quadruple hearsay, whether someone was a witness to the crime, whether they were involved in the crime. And explained that the night before, three people had approached a Justin Harper, asked to use his gun to rob somebody for drugs and money. This Justin Harper gave the gun to a Relly, short for Tyrell, and a Reggie, and described them both as black males. She said that she thought the police may have two suspects at the station named Lou and Potty. She said that they were set up guys, and were in the house when the shooting occurred. One of the males was a male black from Aurora, and the other one, she said, was Potty or Poc, with Poc marks on his face, thus the nickname. After the shooting, this Relly and Reggie had returned to Mr. Harper's house, and she gave information as to where the guns may be stashed and things like that. And when looking at the probable cause based on that tip, of course, we look at the totality of the circumstances and determine the informant's veracity, reliability, and the basis of knowledge, because the lower degree of any of that, the more corroboration that would be needed. The informant did not identify herself. She doesn't have a track record of providing reliable information, and if you look at the court's decision, the court stated it was in no position to determine the reliability of the person providing the tipster with information, no evidence as to the informant herself to determine her reliability. The informant had nicknames of the set-up men wrong, guesses as to their physical characteristics were wrong, but he still found probable cause based on other information. And the court commented on how the informant knew that two black males were in the house when the shooting occurred, but if you look at the tip, only one of the males is described as a black male. The tip did not describe two black males. The court also held that because the police knew that one of the men used a phone in the residence, that was consistent with the claim that they were set-up men. I believe that's arbitrary, baseless, because there's no explanation from the tipster or information from the officers describing what set-up men means. No information what was alleged on the telephone call, but even so, again, no connection with set-up men and phone call or anything of that nature. This time. Thank you, Your Honor. I have a question. Yes. The court didn't find that probable cause failed to exist at the time of the first interview. The court found during the first interview they weren't in custody. It didn't require a probable cause examination at that time. He said they weren't in custody. And then the court went on to find when they were hauled back in and not allowed to leave, that's when custody occurred. Correct. And at that moment, probable cause existed. Correct. And the court, when I listened to your argument, I hear you saying the court only focused on the anonymous tip. But he didn't. He considered all the information. What the, I believe the court erred in both respects, Judge, because the court held that they were not in custody because a reason for The court's determination that they were in custody when they were taken back and put in separate rooms after they left the lobby. Correct. Right. And all of the information that would have been known at the time was the anonymous tip. There's more than the tip, though. Other than the fact that of the defendant's statements that they were there, but that they were friends, that they were hanging out and unknown subjects had kicked in the door and shot somebody. And Moore's statement that Mays got two phone calls just before the men came in. Correct. And there were other witnesses that said the same thing. Just before the intruders came in, there were two phone calls to Mays. Correct. He made calls and he received calls. And what I'm submitting, Judge. And why isn't that probable cause standing alone, even? In regards to the probable cause determination. If someone with intimate knowledge is explaining what set up men means or even had the descriptions of the people at the station right, whether it's nicknames or physical characteristics, even then. You've answered my question. Thank you. Thank you. Mr. Rado. May it please the court. Good morning, Your Honors. Counselor. I'm not sure there's a lot more that I can say other than what has already been addressed in the brief that responds to Mr. Murphy's argument. The testimony of the officers was pretty clear. I mean, we conceded in our brief that when they were put in handcuffs and taken in the police cars to the station, they were in custody. It's what happens after that. The officer has them released from the handcuffs. He tells them, no, you're witnesses. You're not under arrest. Detective Deutschler also says, testifies, she told them they're not under arrest, free to leave at any time. She also testifies that they agreed. But if that is true, then why would Defendant Mays have to ask permission and have that same detective stand at the door with him to smoke a cigarette because you can't get back in? You're free to leave. Go around and ring the bell and come in like everybody else. Well, why bother waiting or why bother letting him do that? I mean, you're going to escort him there and escort him back, so it's a matter of convenience. And there's a real explanation of them. And I'm not sure that his argument is relevant to Mr. Moore, what he was told. Is it possible that Mays could have been in custody and Moore was being treated differently? Well, I mean, anything is possible. I'm just not certain why we're looking at the way Mays was treated in relation to whether Moore was in custody. I don't think that we should be focusing on that. That's why we've really kept them separate matters. All right, well, then I'll ask another question and deal strictly with Moore. If he's in an orange jumpsuit and doesn't have a cell phone and they say he's free to leave, how exactly is it that he accomplishes that? Well, he was escorted to the lobby and said, you can leave. But he said, oh, I don't have my—or was it Mays? One of the two said, I don't have my rental car key. That's Mays, so we're dealing only with Moore. Right, so he was going to leave with Mays, apparently. But he could have left— No, this is this whole time. I mean, if you're sitting in a jail and you're in an interview room and you have an orange jumpsuit and— Well, it's not a jail. He's in the interview room. It's a police station, yes. But that's all the police had is an orange jumpsuit. They don't have spare clothing around to give to people. And there was a good reason why they took his clothes. He had blood evidence on him. And regardless of whether you're going to say, well, is that the defendant's blood or not, or the victim's blood or not, as you indicated, you still have to have it taken into custody. It's evidence. And the police would be a dereliction of duty not to take that into evidence. And what are they supposed to do, send him on his way? Oh, go ahead and contaminate that evidence and then bring it back with some new clothes. I mean, I think that under the circumstances, and really, remember, you looked at the totality of the circumstances here, you have to determine what's the best approach, and the police determined taking it into custody as soon as possible was the best approach. I mean, you don't want that evidence contaminated any further. He already had urine and vomit all over him. Now, he indicated it was the victim's vomit, but certainly it was his urine. And who knows what other thing might have contaminated it if he was allowed to leave. What did happen during that 10 hours? Does anybody know? I mean, just sitting there? As far as we know, he was just sitting around. But that doesn't necessarily mean— Sitting around, sitting in the interview room. It's not real clear where they're at because he had to go locate, I believe, Liberian? Tessa, he had to go locate the defendant. Well, he wouldn't have to locate him if he knew where he was in the interview room. So it's not 100% clear. 10 hours later. 10 hours later, they're somewhere in the police station. But the length of time that you're spending in the police station doesn't necessarily mean that you are in custody. There are a couple of cases which Perez, in particular, he was asked to come down to the police station. Slightly different facts, obviously. But he was still transported by the police on 9-25, September 25th. He's there for about 48 hours. On 9-27, he finally makes some admissions to the police. The court found that that wasn't an unreasonable length of time. Why? Because he was considered a crop-weeding witness. And that's what Mr. Moore was being considered at this particular point in time. He was asked if he would cooperate. Cooperating with what, though, during those 10 hours? Oh, during the 10 hours. I mean, didn't they get what they wanted? I mean, from what they knew, they got this man's cell phone because they said, hey, we think his cell phone was used. And your clothes, he didn't have a weapon. He didn't have anything else. What, I mean, you know, what do they do and say, what are you sticking around here for? Well, what was Mr. Perez doing for 48 hours? I'm not answering about Mr. Perez. I'm answering about Mr. Moore. I don't know who he is. If he's free to go, nobody questions him? Nobody talks to him for 10 hours? No. What do they want from him? He should have said, okay, I'm going to go now, or just left. He decided to stay. He told, the testimony was more from Detective Bish in particular, more than, the defendant said he was more than willing to cooperate, that John Rosales was a friend of his, and he would do whatever it took to help us, and he declined that. And I get that. I get that. But if, so you're saying that people can just come in and say, hey, I want to help with this crime, and I'm going to stay here until it's solved, and the police are going to let them sit in their interview room for 10 hours and just be, as a witness, you know, hey, we took your statement, we took some information from you? It's an ongoing investigation. They're trying to get as many facts as they can, and then they can come back and verify with the witness if they need to. It's a matter of the, go ahead. Couldn't they have picked him up at home or called him later or something like that? I mean, it wasn't like they were actively involved or even passively involved. I mean, there was nothing happening that we know of. Am I missing something? Well, I would say that cases, though, support the fact that you can have a defendant or a witness sitting around for several hours. Perez, Fair, other cases have said that just the mere fact that you're sitting there in the station, as long as you're a cooperating witness, as long as you're not at that point under arrest, they can stay there for eight hours, two days, who knows how long. I mean, as long as it's voluntary.  Well, Officer Wagner, as pointed out by, I'm sorry, go ahead. As the defense counsel pointed out, there was an officer who initially said that he was waiting outside the room. It doesn't say how long necessarily he was outside the room, but that doesn't necessarily go to the state of mind of the defendant. He didn't know that Wagner was staying outside the room, and we looked at the totality of circumstances of what the defendant would have thought at the time. And if he doesn't know that Wagner was outside the room, he couldn't possibly understand. Was the door closed? Apparently it was closed, but it was unlocked. There were two doors to the interview room. Both were unlocked. But, I mean. Did he know that? It is unclear. I don't know that it's clear that he knew that. That they were unlocked. But there was testimony that they were unlocked. But I see your point. However, there was repeated testimony saying that he was willing to cooperate and do whatever was necessary to assist the police. And if that was intending staying around as long as necessary, then so be it. I mean, that goes to the state of mind. Was he in custody? And the judge's findings, you have to find that they were against the manifesto of the evidence. The judge here, there's certainly evidence, testimony to support the finding that he believed he was there, not in custody. That he was there voluntarily to assist the police in any way that was possible. Can you, for a moment, assume that they were in custody from the moment they arrived at the station? And that didn't change once they took the handcuffs off. Was there probable cause at that time? Certainly debated that particular point. Is there probable cause to believe that two individuals who were found on the driveway at the scene of the shooting could be at least detained for questioning? I would argue that there's at least reasonable suspicion to continue investigation towards them. And they were Mirandized? They were not Mirandized during the initial interviews. They were not Mirandized until after they were taken into custody at 3.50, 3.55, so in the afternoon. That was when they were Mirandized. Is that when they came to the lobby and said you have to stay? Correct. They took them to the lobby and said, okay, we don't need you right now. They agreed that they would come back the next day to give further statements. Again, ongoing investigation. As your comment was, couldn't they have let them go and come back? They were doing that several hours later. If I were to happen to agree that that anonymous tip didn't add anything, is there still probable cause? At that point, there was multiple witnesses that had been interviewed. We have at least six witnesses other than Mr. Moore who have been talked to. You have the facts of they knew that there was a shooting. They knew that there was they had looked at the cell phones with consent of Mr. Moore. They had other information. I think you could make an argument of probable cause. Certainly the corroboration of all those witnesses and all that other information for that anonymous tip. The state's position is arguably there's probable cause without the anonymous tip. Correct. Do you have a position with regard to whether there was probable cause before that? Before that, as I said, we conceded that they were in custody, but our point of position is that they were released. Are you conceding there was not probable cause? Probably not at the initial, when they were initially brought into the station. Thank you. Thank you. Thank you. You talked about witnesses. There weren't other witnesses in the house, were there? There were some hints here in both of your arguments, but I was not aware that there were just the three of them, I thought, in the house. I believe there was an Eric Smith and a Michael Berry. Eric Smith, I think, had left right beforehand. I believe Michael Berry was still at the time of the shooting. Yes, because one of them testified that there was two calls received by Mr. Mays, right before the shooting occurred. So they would have had to have been present when that happened. Is that using Mr. Moore's phone or Mr. Mays' phone? I think it was Mr. I'm drawing a blank on that. I'm also arguing Mr. Mays this afternoon. I believe it was Mr. Mays' phone because he got a call from, two calls. One he said was from his girlfriend and then another woman he claimed at that time. It was Mr. Mays. As far as why they would split up witnesses, that happens periodically in any investigation. You stand over here, I'm going to talk to this person, even a simple traffic accident that occurs. So I don't think that that's really relevant. All right. Unless there's any other questions, we'll stay on the remaining portions of our brief. Okay, thank you, Your Honor. Thank you. Mr. Murphy, any rebuttal? Your Honor, there's one other thing that the State brought up during these 10 hours where Mr. Moore is left presumably downstairs is if you want him to leave, why didn't he ask or just say I'm leaving? I think that sheds light on what he was thinking and what any reasonable person would be thinking at that point when they're left alone for 10 hours in an orange jumpsuit, without your cell phone, without any access to a ride, et cetera. And the fact is that they were led, the testimony was that this area, this lower level section was a secure area, a secure area. And you also had testimony from Officer Rimgis. I know we're applying this to Mr. Mays that he would, and the question was asked during that part of the testimony, but that he would not have let Mr. Mays walk out and just walk out of the station. And the reason we can look at that in relation to Mr. Moore is there's no reason to think that these people are being treated any differently. They're both the individuals that were found in the driveway. They're both individuals that were brought to the station. And they both gave the same story in the initial interview. Just to quickly distinguish people v. Fair and people v. Perez, in Fair, the defendant voluntarily walked into the station, as opposed to having been ordered to the ground at gunpoint, handcuffed, and transported as the defendants were here. In Perez, the reason he was kept secluded, even though he also was asked and he voluntarily came to the police station, is that the defendant in Perez did not want other individuals to know of his cooperation with the police. Those are so far from the circumstances here, they're just completely an opposite. And saying that because there were so many hours there that you can't hold that there were so many hours here, that they were in custody, just doesn't make sense. They don't relate to each other. One of the things I wanted to address, Justice Wright, is your question regarding what was the probable cause. What was all the information known at the time the court concluded that they were under arrest? And I think the state did exactly what the trial court did, was that it misinterpreted. What information was actually known at that moment? The state said that there were multiple other witnesses interviewed. That's not true. We had Mr. Berry and Mr. Smith, but they didn't provide anything regarding suspicion of Mr. Moore, other than there was a statement that Mr. Mays had used his phone. But that's it. What is that at? I don't believe the police at that moment knew regarding what setup man was, and that there was a phone call used in order to be a setup man, whatever the informant meant by that. The fact that someone was on the phone just actually provides nothing. Well, the focus is Moore didn't make the call. That's it. That's the appeal here. And the focus is, what I'm trying to do, is dissect. I appreciate that. But Moore did not make the call, and they didn't have any information that Moore had made a phone call. Correct. And regardless of who made the phone call, the police did not have the phone records at that point and were able to match anything at the point of arrest. That was all later. Same with the information that the court said regarding – and the court actually, in finding the probable cause, used the words that some of the information that the informant had was predictive, and specifically regarding the involvement of Justin Harper and details as to his involvement. Again, all of that information is much later after the arrest. After getting in on his call, the officer sent people out to locate this Justin Harper and do an investigation. So what the police did was arrest first and corroborate later. None of the information that was corroborated or found out or discovered after the arrest has any relevance or any bearing to the determination of whether or not there was probable cause at the moment they were placed under arrest. Because of that, Judge, because the court erred in considering that post information, and because I believe the state was conceding that there was not probable cause at that moment that they were under arrest, merely a reasonable suspicion, which would have allowed them to briefly detain him at the scene. That is why the court erred, respectfully erred, in failing to grant the motion to quash arrest and suppress evidence. And I'm asking this court to fix that error. Thank you. Thank you, Mr. McCrory. Thank you both for your argument today. We will take this matter under advisement and get back to you as a written disposition in a short way. We'll now take a short recess for a panel change.